**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

PLAINVIEW WATER DISTRICT,

                 Plaintiff,

   **-against-**

THE 3M COMPANY (F/K/A MINNESOTA
MINING AND MANUFACTURING CO.);
EIDP, INC.; THE CHEMOURS
COMPANY; DUPONT DE NEMOURS,
INC., and CORTEVA, INC.

                 Defendants.

**Complaint for a Civil Case**

Case No.  23-cv-03919

Jury Trial Demanded

**Table of Contents**

**I.**   **Introduction** ...................................................................................................... 1

**II.**   **Parties** ................................................................................................................ 2

**III.**   **Jurisdiction and Venue** ................................................................................... 6

**IV.**   **Factual Allegations** .......................................................................................... 6

    A.   PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards ............................................................................................... 6

    B.   Defendants' Production of PFAS Products ................................................. 9

    C.   Defendants' Knowledge of Threats Posed by Their PFAS Products ........................ 10

    D.   Major Sources of PFAS in the Environment ............................................... 14

    E.   The District Is Injured. ........................................................................ 15

    F.   Treatment of PFAS ............................................................................ 16

    G.   Old DuPont's Multi-Step, Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors ........................... 16

        i.   Step 1: The Chemours Spinoff ................................................... 21

        ii.   Step 2: The Old Dow/Old DuPont "Merger" .................................. 26

        iii.   Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow.... 27

    H.   The Effect of the Years-Long Scheme to Defraud the District and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities ............. 31

**V.**   **Causes of Action** ............................................................................................ 34

FIRST CAUSE OF ACTION
Strict Products Liability for Defective Design ................................................... 34

SECOND CAUSE OF ACTION
Strict Products Liability for Failure to Warn ..................................................... 37

THIRD CAUSE OF ACTION
Negligence ............................................................................................. 39

FOURTH CAUSE OF ACTION
Public Nuisance ....................................................................................... 40

FIFTH CAUSE OF ACTION
Trespass ....................................................................................................................... 42

SIXTH CAUSE OF ACTION
Fraudulent Conveyance—Violation of New York's Debtor & Creditor Law
("NYDCL") ................................................................................................................. 43

VI.    **Prayer for Relief** ........................................................................................................ **47**

VII.    **Demand for Jury Trial** ............................................................................................... **47**

## I.    Introduction

1.    Plaintiff Plainview Water District ("the District," or "Plaintiff") is a public drinking water provider serving approximately 21,700 people in Nassau County, New York. The District brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells, which are contaminated with toxic per- and poly-fluoroalkyl substances ("PFAS"),[1] including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from Defendants' products.[2]

2.    Defendants The 3M Company, EIDP, Inc. ("Old DuPont"), f/k/a E.I. DuPont de Nemours and Company, and the Chemours Company (collectively, "Manufacturer Defendants"), manufactured, marketed, sold, and/or promoted PFOA, PFOS, and other PFAS; products containing PFAS; and/or products that degrade to PFOA, PFOS, or other PFAS upon release to the environment. Herein, Manufacturer Defendants' products are collectively referred to as "PFAS Products," and include, but are not limited to, fluoropolymers, coatings, and consumer products. Defendants Old DuPont, Chemours, DuPont de Nemours, Inc. ("New DuPont"), and Corteva, Inc. ("Corteva"), (collectively, "Fraudulent Conveyance Defendants"), engaged in a series of fraudulent conveyances to obstruct potential creditors, like the District, from accessing assets

---

[1] The Complaint encompasses all of the thousands of PFAS, known or unknown (including, but not limited to, the chemicals themselves, as well as all of their salts, ionic states, acid forms of molecules, and "precursor" chemicals). At the time of filing for this Complaint, the State of New York has a combined MCL for PFOA and PFOS of 10 ppt combined, and a proposed MCL of 10 ppt for four new PFAS; PHDA, PFHpA, PFHxS, PFNA, as well as a proposed MCL of 30 ppt for all six PFAS listed (HLT-40-22-00000-2, available at https://dos.ny.gov/system/files/documents/2022/10/100522.pdf). EPA also has proposed MCLs for PFAS at the time of filing for this Complaint as follows:  4 ppt for PFOS and 4 ppt for PFOA (available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas). The District reserves its right to identify additional PFAS through discovery and as the science and research on PFAS develops.
[2] The District reserves its right to bring additional claims should it incur injuries attributable to the presence of other PFAS in its wells.

1

sufficient to satisfy legal liabilities arising from the manufacture, sale, and promotion of PFAS products and/or products that degrade to PFAS upon release to the environment.

3.      PFAS are toxic, not easily biodegradable, persistent in the environment, and pose a significant risk to human health and safety. PFAS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

4.      Manufacturer Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment.

5.      Nonetheless, Manufacturer Defendants manufactured, marketed, sold, and/or promoted their PFAS Products to industrial facilities and consumers in New York, with the knowledge that those compounds would be discharged to the land and water in New York as a waste product of certain industrial manufacturing processes, and/or during normal use and disposal of such products, among other normal and foreseeable uses.

6.      The District files this lawsuit to recover compensatory damages and all other remedies, including but not limited to all necessary funds to reimburse the District for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from its drinking water wells, and all associated costs, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than the District and its ratepayers.

## II.    Parties

7.      **Plaintiff Plainview Water District** is a public drinking water provider that serves a population of approximately 27,100 in the Town of Plainview, Nassau County, New York.

2

8.      The District currently operates twelve municipal supply wells distributed throughout its service area.

9.      As of the filing of this complaint, nine of the District's twelve wells are already contaminated with at least one PFAS compound. PFAS are spreading throughout the aquifer system from which the District draws its drinking water supply, further threatening the District's already-contaminated wells and the as-yet uncontaminated wells.

10.      The District has a duty to exercise due care and diligence in the maintenance and supervision of its public water system to prevent its pollution and depletion pursuant to 10 NYCRR § 5-1.71.

11.      The District has a duty to exercise due care and diligence in the maintenance and supervision of its public water system to ensure the protection of the public health pursuant to 10 NYCRR § 5-1.51.

12.      In carrying out its powers, duties, and responsibilities, the District acts in all respects for the benefit of the people of the Plainview Water District and the State of New York, for the protection of their health, welfare, and prosperity.

13.      **Defendant The 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in New York. At all times relevant, 3M marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products in the United States, including in New York.

14.      **Defendant EIDP, Inc.,** ("Old DuPont"), f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business in Wilmington, Delaware. Old DuPont does business throughout the United States, including in New York. At all times

3

relevant, Old DuPont marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products throughout the United States, including in New York.

15.     **Defendant The Chemours Company** ("Chemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. Chemours was incorporated as a subsidiary of Old DuPont until approximately April of 2015. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of Old DuPont's performance chemical business and began operating as an independent company. As part of this spin-off, Chemours assumed certain environmental liabilities associated with Old DuPont's historical business lines, including those related to PFAS. Old DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of Old DuPont in this spin-off. Chemours has filed a complaint against Old DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities.  Since its inception, Chemours marketed, promoted, distributed, developed, manufactured, distributed, released, trained users, produced instructional materials, and/or sold certain PFAS and/or PFAS Products, including in New York.

16.     **Defendant DuPont de Nemours, Inc.** ("New DuPont"), f/k/a DowDuPont Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours (defined *infra*), Old DuPont merged with Old Dow (defined *infra*) and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including

4

those relating to PFAS. At all times relevant, New DuPont does and has done business throughout the United States, including in New York.

17.    **Defendant Corteva, Inc.** ("Corteva"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805. In 2019, New DuPont (defined *infra*) spun off a new, publicly traded company, Corteva, which currently holds Old DuPont (defined *infra*) as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. At all times relevant, Corteva is and has been registered to do business in New York.

18.    Defendants 3M, Old DuPont, and Chemours are collectively referred to herein as the "Manufacturer Defendants."

19.    Defendants Old DuPont, Chemours, New DuPont, and Corteva are collectively referred to herein as the "Fraudulent Conveyance Defendants."

20.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

21.    All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

### III.   Jurisdiction and Venue

22.   The United States District Court for the Eastern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000.

23.   This Court has jurisdiction over Defendants because, based on information and belief, each Defendant has sufficient minimum contacts in New York or otherwise intentionally avails itself of the New York market either through the distribution or sale of products containing or that degrade to PFOA and/or PFOS in the State of New York so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice. Each Defendant is a corporation or other business authorized to do business in New York and registered with the New York Secretary of State.

24.   Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and harms giving rise to this case occurred, or a substantial part of the property that is the subject of this action is situated, in the Eastern District of New York.

### IV.   Factual Allegations

#### A.  PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards

25.   PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

26.    PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble and do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

27.    PFOA and PFOS bioaccumulate and biomagnify in people and other organisms.

28.    Scientists link PFOA and PFOS with a wide range of serious public health impacts.

29.    PFOA and PFOS contamination presents a serious threat to public health through drinking water.

30.    PFOA and PFOS enter the environment from industrial facilities that manufacture PFAS Products. PFOA and PFOS release to land and water from a multitude of industrial sites that are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

31.    On April 26, 2017, Governor Cuomo signed the Clean Water Infrastructure Act, a $2.5 billion investment in drinking water infrastructure, clean water infrastructure, and water quality protection across New York. The legislation requires all New York-based water systems to test for PFOA and PFOS contamination.[3]

---

[3] Press Release, New York State, Governor Cuomo Signs Legislation Investing $2.5 Billion in Clean Water Infrastructure and Water Quality Protection (Apr. 26, 2017), *available at* https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-investing-25-billion-clean-water-infrastructure-and-water.

32.     In September 2017, Governor Cuomo announced his appointees for a 12-member Drinking Water Quality Council tasked with ensuring all New Yorkers have access to safe and clean drinking water. The Council's initial responsibility was to recommend enforceable Maximum Contaminant Levels ("MCLs") for PFOA and PFOS as priority emerging New York contaminants that remain unregulated by the federal government.[4]

33.     In December 2018, the Drinking Water Quality Council recommended that the New York Department of Health adopt MCLs for PFOA and PFOS of 10 parts per trillion ("ppt"),[5] rendering enforcement imminent.

34.     In July 2019, Governor Cuomo announced that the New York Department of Health planned to adopt the recommended MCLs for PFOA at PFOS at 10 ppt for each compound. The public comment period is underway, and the MCLs are expected to become enforceable without change. Enforcement is imminent.[6]

35.     The establishment of health-based MCLs triggers certain State regulatory requirements governing the District's wells and operations; in some circumstances action is required even if levels contamination levels are below the MCL to protect against MCL exceedances. Such State requirements include, but are not limited to, required investigatory and

---

[4] Press Release, New York State, Cuomo Announces Appointees to Drinking Water Quality Council to Safeguard New York Drinking Water Supplies, (Sep. 22, 2017), *available at https://www.governor.ny.gov/news/governor-cuomo-announces-appointees-drinking-water-quality-council-safeguard-new-york-drinking.*

[5] Press Release, New York State, Drinking Water Quality Council Recommends Nation's Most Protective Maximum Contaminant Levels for Three Unregulated Contaminants in Drinking Water (Dec. 18, 2018) *available at* https://www.health.ny.gov/press/releases/2018/2018-12 18_drinking_water_quality_council_recommendations.htm.

[6] Press Release, Governor Cuomo Announces Availability of $350 Million for Water System Upgrades Statewide and Directs Health Department to Begin Adopting Maximum Contaminant Levels for PFOA, PFOS, and 1,4-Dioxane (July 8,2019), *available at* https://www.governor.ny.gov/news/governor-cuomo-announces-availability-350-million-water-system-upgrades-statewide-and-directs.

remedial action by public water suppliers to protect public health, including by taking action to remove PFAS contamination from water in its wells.

**B.   Defendants' Production of PFAS Products**

36.    PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

37.    For most of the past several decades, 3M has been the primary manufacturer of PFAS.

38.    3M began producing PFOA and PFOS as raw materials that it used to produce other products, or that it sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS. 3M went on to market several PFOA and PFOS Products, including its Scotchguard brand of stain repellant, food packaging, textile treatments, fluorosurfactants and additives, and others. 3M ceased PFOA production in 2002 under pressure from the U.S. EPA.

39.    Old DuPont began production for sale of polytetrafluoroethylene ("PTFE"), a fluoropolymer, in or around 1951. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. Old DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e. a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water or oil; a lubricant; a coating for catheters and other medical equipment; an oxidizer in flares; in dental fillings; and many others. Old DuPont has produced and produces numerous other PFOA and PFOS Products. Old DuPont also began producing PFOA as a raw material for its own use and for sale in or around 2002, after 3M ceased PFOA production.

**C. Defendants' Knowledge of Threats Posed by Their PFAS Products**

40.  For more than 50 years, Manufacturer Defendants were or should have been aware of the dangers posed to people by exposure to their PFAS Products (including via drinking water); and that the production and use of PFAS products resulted in the release of PFAS to the environment. Despite this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFAS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to the District's drinking water production wells.

41.  By 1956, PFAS from 3M's products were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

42.  3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

43.  Old DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

44.  As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

45.  By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

10

46. By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

47. In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

48. As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

49. Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. Old DuPont was aware of 3M's findings no later than 1981.

50. Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

51. In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between

11

effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

52.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own scientists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

53.    In 1981, Old DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

54.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

55.    Old DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont facilities in West Virginia and Ohio, Old DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. Old DuPont chose not to use either, despite knowing of PFOA's toxicity.

56.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed Old DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32

years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use, and had "no incentive to take any other position."

57. In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

58. By at least 1993, Manufacturer Defendants were aware that PFAS was linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

59. Despite its understanding of the hazards associated with its PFAS Products, 3M actively sought to suppress scientific research on the hazards associated with those products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health and ecological risks of its PFAS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

60. In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the

long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

61.    All Manufacturer Defendants knew or should have known that in their intended and/or common use, their PFAS Products would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Manufacturer Defendants.

### D. Major Sources of PFAS in the Environment

62.    Manufacturing facilities where Manufacturer Defendants' PFAS Products are synthesized and made into products or chemical feedstocks, or where PFOA and PFOS are used as processing aids, as well as secondary manufacturing facilities where PFAS Products such as PTFE are applied to other products, are major PFAS release sites. Industries that are known sources of PFAS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

63.    There are several current and former industrial sites near the District's wells or located in the vicinity of sources of the District's water supply that are likely to have contributed to the release of PFAS from Manufacturer Defendants' PFAS Products, and consequent contamination of the District's wells.

64.    Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer goods. PFAS in landfills and former landfills can leach from these wastes into ground and surface water. PFAS may also be released from landfills in fugitive dust or directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not

required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate. The climatic conditions in New York are particularly suited for the generation of leachate, and the hydrogeologic setting makes groundwater highly vulnerable to PFAS impacts from leachate.

65.     There are several current and former landfills near the District's wells or located in the vicinity of sources of the District's water supply that are likely to have contributed to the release of PFAS from Manufacturer Defendants' PFAS Products, and consequent contamination of the District's wells.

66.     Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer items containing PFAS. These facilities provide multiple pathways for PFAS from industrial and consumer items to contaminate groundwater, surface water, or both, including by point source discharges of effluent; leakage or unintended releases from sewerage or surface impoundments; air emissions; or disposal of biosolids or other byproducts generated during the treatment process.

E.  **The District Is Injured.**

67.     PFOA and PFOS have been detected in varying amounts at varying times in the District's wells, including at levels that have compelled the District to take responsive actions. In addition, PFOA and PFOS's high mobility and persistence in soil and groundwater means they will likely continue to spread and affect the District's wells in the future.

68.     Manufacturer Defendants' PFAS Products are the major sources of the PFAS released to the environment that ultimately reached groundwater that supplies the District's production wells. PFAS have reached those wells due to the routine, foreseeable, and intended use and disposal of Manufacturer Defendants' PFAS Products in the vicinity of locations from which

15

the District obtains water, including its groundwater wells. Such use, disposal, and environmental transport has brought PFAS to the District's wells from releases at a myriad of diffuse sources such as industrial and manufacturing facilities and businesses; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and others.

69.     To address PFAS contamination in its wells, the District has, inter alia, incurred expenses in developing plans to address PFAS in a subset of its wells, including by planning to add or reconfigure wellhead treatment. The District anticipates taking these and additional steps to address the continuing and future PFAS contamination in its wells attributable to Manufacturer Defendants' tortious conduct.

F.  **Treatment of PFAS**

70.     The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate and maintain.

G.  **Old DuPont's Multi-Step, Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors**

71.     Old DuPont sought to insulate itself from billions of dollars of legacy environmental liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country, and these efforts have included unlawful attempts to shield assets from liability for PFAS contamination, including liability for PFAS contamination in New York.

72.     Old DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity

16

of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

73.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey and West Virginia, and at Fayetteville Works in North Carolina. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, like those in the District, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS.

74.    For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination from a landfill that had accepted PFOA wastes from the nearby Old DuPont's Washington Works plant in West Virginia, sued Old DuPont in West Virginia federal court.

75.    Old DuPont's in-house counsel was very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

17

76.     In 2005, after settling the Tennant case, Old DuPont settled claims by EPA for violations of TSCA and RCRA related to PFAS.

77.     Also, in 2005, a West Virginia court entered a final order approving a 2004 settlement with Old DuPont of a class action lawsuit filed on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

78.     Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

79.     By 2012, after seven years of studies, the Science Panel confirmed "probable links" between class-member exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

80.     After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the

U.S. District Court for the Southern District of Ohio. A number of trials were scheduled to take place in 2015 and 2016.

81.    Old DuPont must have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, and that its liability was likely in the billions of dollars.

82.    Anticipating this significant liability exposure, Old DuPont had convened an internal initiative known as "Project Beta" on or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

83.    In furtherance of possible restructuring opportunities, including potential merger structures, in or around 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals."

84.    However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

85.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

86.    Old DuPont engaged in a three-part restructuring plan, as described below.

87.    The first step in Old DuPont's plan was to transfer its performance chemicals business (which included Teflon® and other products) ("Performance Chemicals Business") into

19

its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

88.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities and that Old DuPont still faced direct liability for its own conduct.

89.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

90.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

91.    The third step involved DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

92.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

93.    New DuPont and Corteva now hold the vast majority of the tangible assets that Old DuPont formerly owned.

94. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like the District, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

95. In greater detail, the restructuring was implemented as follows.

### i.    Step 1: The Chemours Spinoff

96. In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

97. On April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

98. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, and Chemours became a separate, publicly traded entity.

99. At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

100. Prior to the Chemours Spinoff, Chemours's Board of Directors had three members, all of whom were Old DuPont employees.

101. On June 19, 2015, a fourth member of the Board, who had served as a member of Old DuPont's Board of Directors from 1998 to 2015, was appointed.

102. On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

103. To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

104.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

105.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

106.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

107.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

108.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the District here, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. The Chemours Separation Agreement also required Chemours to assume billions of dollars of Old

22

DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

109. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

110. Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

111. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

23

112.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

113.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Court does not limit Chemours's liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

114.    There was no meaningful, arms'-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

115.    In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

116.    Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont.

117.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its

24

"significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

118. Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

119. At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

120. For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

121. Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

122. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

25

123.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

### ii.    Step 2: The Old Dow/Old DuPont "Merger"

124.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

125.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

126.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

127.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

128.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed

26

DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

129.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

130.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

131.    The below image reflects the corporate organization following the "merger":



### iii.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

132.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and

"divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

133.    It is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

134.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

135.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

136.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

137.    The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment:

28



138.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

139.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

140.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

29

141.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

142.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the District's claims in this case.

143.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The District can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the District's water resources.

144.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

145.    On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

146.    Corteva now holds 100% of the outstanding common stock of Old DuPont.

147.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

148.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont,

respectively,      following      the      separations      are      depicted      below:



149.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont

de Nemours, Inc. (*i.e.*, New DuPont).

150.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**H.    The Effect of the Years-Long Scheme to Defraud the District and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

151.    The net result of these transactions was to strip away valuable tangible assets from

Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are

worth.

31

152. Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

153. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

154. For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

155. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

156. Also, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

157. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

158.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

159.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

160.    In addition, the District's position is not protected by the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

161.    Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value.

162.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

163.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital, a private equity firm.

164.    On December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances, Inc., a manufacturer and supplier of flavors and fragrances used in the food, beverage, personal care, and household products industries, for $26.2 billion. That transaction closed in February 2021.

165.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron, a global maker of semiconductor wafers.

166.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

167.    Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied— holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

168.    The Chemours Spinoff constitutes a fraudulent conveyance, which entitles the District to, among other things, avoid the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and subsequent separations of New DuPont and Corteva likewise constitute fraudulent conveyances that entitle the District to, among other things, recover property and value transferred to New DuPont and Corteva.

## V.    Causes of Action

### FIRST CAUSE OF ACTION
### Strict Products Liability for Defective Design
### (Against All Defendants)

169.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

34

170.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

171.    Defendants knew that third parties would purchase their PFAS Products and use them without inspection for defects.

172.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of, and/or in a manner that has resulted in the contamination of, Plaintiff's drinking water production wells. Such discharges occurred at various locations, at various times, and in various amounts.

173.    Defendants' PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

174.    Defendants knew or reasonably should have known that the use of their PFAS Products in their intended manner would result in the spillage, discharge, disposal, or release of PFAS onto land or into water.

175.    The PFAS Products in Plaintiff's drinking water production wells were defective in design and unreasonably dangerous because, among other things:

    a.    PFAS cause extensive and persistent groundwater contamination when they, or products containing or degrading to them, are used in their foreseeable and intended manner.

    b.    PFAS contamination in drinking water poses significant threats to public health and welfare.

35

c.  Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

176.  At all times relevant to this action, Defendants' PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

177.  Defendants knew or should have known about feasible alternatives to their PFAS Products without the use of PFOA or PFOS, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

178.  As a direct and proximate result of the defects previously described, several of Plaintiff's wells have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiff significant injury and damage.

179.  As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

180.  Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an

36

award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

181.    Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

182.    As described above, New DuPont and Corteva assumed Old DuPont's design defect liability.

**SECOND CAUSE OF ACTION**
**Strict Products Liability for Failure to Warn**
**(Against All Defendants)**

183.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

184.    As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS Products, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

185.    Defendants knew that third parties would purchase PFAS Products and use them without inspection for defects.

186.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of, and/or in a manner that has resulted in the contamination of, Plaintiff's drinking water production wells.

187.    The PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

188. Defendants knew or should have known that the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS onto land or into water.

189. The PFAS Products in Plaintiff's drinking water production wells were defective in design and unreasonably dangerous products for the reasons set forth in herein.

190. Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS Products, including contamination of public drinking water wells with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

191. In particular, Defendants failed to describe such hazards or provide adequate precautionary statements regarding such hazards in the labeling of their products containing PFAS or otherwise.

192. As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of PFAS Products that were, or reasonably should have been, known to them, PFAS contaminates several of Plaintiff's wells in varying amounts.

193. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

194. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard of the probable dangerous consequences of that conduct and its

38

reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

195.    Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

196.    As described above, New DuPont and Corteva assumed Old DuPont's failure-to-warn liability.

## THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

197.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

198.    As commercial manufacturers, sellers, distributors, suppliers, marketers, and/or designers of PFAS Products, Defendants owed a duty of care to Plaintiff not to place into the stream of commerce products that were in a defective condition and unreasonably dangerous to drinking water in Plaintiff's service area.

199.    Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous PFAS Products into the stream of commerce, including in the District's service area, even when they knew or should have known about the dangers PFAS posed to drinking water wells.

200.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

201.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

202.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

203.    As described above, New DuPont and Corteva assumed Old DuPont's negligence liability.

**FOURTH CAUSE OF ACTION**
**Public Nuisance**
**(Against All Defendants)**

204.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

205.    The District provides drinking water from its wells to residents and businesses for drinking, bathing, cleaning, washing, and other uses.

206.    Because the District is a public entity, the water it provides to those residents and businesses is a public or commonly held resource. Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

207.    Defendants' acts and omissions, including their manufacture, promotion, marketing, sale, distribution, supply, defective design of, and/or failure to warn regarding PFAS

40

in their products, contaminated the District's wells, rendering water served from them a public health hazard and unfit for human consumption.

208. Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

209. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

210. As an owner of water production wells and purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large because it relies entirely upon its groundwater production wells for its public service functions.

211. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

212. Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

213.    As described above, New DuPont and Corteva assumed Old DuPont's public nuisance liability.

## FIFTH CAUSE OF ACTION
### Trespass
### (Against All Defendants)

214.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

215.    Plaintiff owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in Plaintiff's service area.

216.    Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells.

217.    Plaintiff did not give any Defendant permission to cause PFAS to enter its groundwater wells or any other component of its drinking water distribution system.

218.    Defendants knew or reasonably should have known that PFAS have a propensity to infiltrate groundwater aquifers when released to the environment; are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers, including into drinking water wells and distribution systems; are toxic to human health; and are therefore hazardous to drinking water systems and human health.

219.    Defendants manufactured, promoted, marketed, distributed, and/or sold PFAS Products, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic PFAS into the environment and sewer system, and intrude upon, contaminate, and damage Plaintiff's possessory interest.

220.    Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiff's property.

42

221.    Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

222.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

223.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

224.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

225.    As described above, New DuPont and Corteva assumed Old DuPont's trespass liability.

## SIXTH CAUSE OF ACTION
### Fraudulent Conveyance—Violation of New York's Debtor & Creditor Law ("NYDCL")
### (Against Fraudulent Conveyance Defendants)

227.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

43

228.    Plaintiff seeks all relief available under NYDCL for the Fraudulent Conveyance Defendants' violations of the NYDCL for their fraudulent conveyances as part of the transactions described in Sections IV.G and IV.H, *supra*. Pursuant to the NYDCL, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.

229.    The NYDCL also makes a conveyance fraudulent where it is "made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him" and is "without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NYDCL § 273a.

230.    Sections 274 through 276 of the NYDCL also define the following fraudulent conveyances:

a.    "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NYDCL § 274.

b.    "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NYDCL § 275.

44

c.    "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NYDCL § 276.

231.    The Fraudulent Conveyance Defendants engaged in acts in furtherance of a scheme to transfer Old DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment to which they are or will be owed. As a result of the Fraudulent Conveyance Defendants' acts, omissions and other conduct described herein, Plaintiff has been damaged.

232.    At all relevant times, the Fraudulent Conveyance Defendants have acted with actual intent to hinder, delay, and defraud parties, and/or without receiving a reasonably equivalent value in exchange for the transfer obligation, and they were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

233.    For decades, Old DuPont manufactured, marketed, distributed and/or sold PFAS and/or PFAS Products with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would impact groundwater, and Plaintiff's drinking water supply wells and other components of its water system.

234.    As a result of the transfer of assets and liabilities described herein, the Fraudulent Conveyance Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of PFAS and/or PFAS Products.

45

235.    At the time of the transfer of its performance chemical business to Chemours, Old DuPont had been sued, had notice of suits and/or had knowledge of likely litigation regarding Old DuPont's liability from the manufacture, marketing, distribution and/or sale of PFAS and/or PFAS Products.

236.    At the time of the DowDuPont merger, and at the time of DowDuPont's internal reorganization and realignment that spun off Corteva as an independent public company, Old DuPont had been sued, had notice of suits and/or had knowledge of likely litigation regarding Old DuPont's liability from the manufacture, marketing, distribution and/or sale of PFAS and/or PFAS Products.

237.    The Fraudulent Conveyance Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfers or obligations, and Old DuPont believed or reasonably should have believed that Chemours and Old DuPont would incur debts beyond their ability to pay when they became due.

238.    The claims, judgment, and potential judgments against Old DuPont and Chemours potentially exceed their ability to pay. Accordingly, Plaintiff seeks avoidance of the transfer of Old DuPont's liabilities for the claims brought herein and to render the Fraudulent Conveyance Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it under NYDCL, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## VI.     Prayer for Relief

Plaintiff Plainview Water District prays for judgment against Defendants, jointly and severally, awarding Plaintiff:

a.  Compensatory damages in an amount according to proof;

b.  Punitive damages in an amount to be determined at trial;

c.  Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass and an order enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise encumbering any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont and/or imposing a constructive trust over any proceeds from the sale of Old DuPont assets for the benefit of Plaintiff;

d.  All appropriate declaratory relief, including voiding the Chemours Spinoff and the Old DuPont transfers and divestitures to the extent necessary to satisfy a judgment in this case;

e.  Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

f.  Pre-judgment interest and post-judgment interest; and

g.  All other relief this Court deems just, proper, and equitable.

## VII.     Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Dated: May 25, 2023          Respectfully submitted,

/s/ Matthew K. Edling
Matthew K. Edling

47

MATTHEW K. EDLING
matt@sheredling.com
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
stephanie@sheredling.com
ASHLEY B. CAMPBELL (*pro hac vice* forthcoming)
ashley@sheredling.com
GRETEL L. LEE (*pro hac vice* forthcoming)
gretel@sheredling.com
**SHER EDLING LLP**
100 Montgomery St. Suite 1410
San Francisco, CA 94104
(628) 231-2500

MICHAEL F. INGHAM
mingham@carmanlawteam.com
**CARMAN, CALLAHAN, & INGHAM, LLP**
266 Main St,
Farmingdale, NY 11735
(516) 249-3450

*Attorneys for Plaintiff Plainview Water District*

48